

**IT IS ORDERED as set forth below:**

**Date: September 7, 2021**

_____

**Barbara Ellis-Monro**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE:

SHIRLEY LETT,

     Debtor.

SHIRLEY WHITE-LETT,

     Plaintiff,

v.

BANK OF NEW YORK MELLON
CORPORATION, et al.,

     Defendants.

CASE NO. 10-61451-BEM

CHAPTER 7

ADVERSARY PROCEEDING NO.
20-6031-BEM

## <u>O R D E R</u>

This matter is before the Court on motions for summary judgment filed by Plaintiff

Shirley White-Lett ("Plaintiff") [Doc. 72] and Defendant Newrez, LLC d/b/a Shellpoint Mortgage

Servicing ("Shellpoint") [Doc. 78]. Plaintiff seeks summary judgment against Shellpoint as well

as Defendants Bank of New York Mellon Corporation ("BONYMC") and Select Portfolio Servicing, Inc. ("SPS" and with BONYMC and Shellpoint, the "Defendants"). Each motion has been fully briefed by the parties and is ripe for determination.[1] This Order will address Plaintiff's motion against BONYMC and Shellpoint; her motion against SPS will be addressed by separate order.

Plaintiff initiated this proceeding by filing a complaint on February 6, 2020. [Doc. 1]. In the complaint, Plaintiff seeks a determination that her personal liability on her mortgage debt was discharged and requests sanctions for Defendants' violation of the discharge injunction in 11 U.S.C. § 524. The Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(O).

## I. Summary Judgment Standard

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure ("Rule") 7056. Rule 56 requires the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). When, "the nonmoving party bears the burden of proof at trial, the moving party may discharge this 'initial responsibility' by showing that there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial." *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The movant is required to file a separate statement of facts, numbered separately, as to which it contends there are no genuine issues to be tried. BLR 7056-1(a)(1). Facts set forth in the statement of facts must be supported by "citing to particular parts of materials in the record, including … affidavits …." Rule 56(c)(1)(A).  Affidavits "must be made on personal knowledge, set out facts

---

[1] BONYMC also filed a motion for summary judgment, which was denied by a separate order. [Docs. 77, 107].

that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Rule 56(c)(4).

The respondent is required to file a statement of facts, numbered separately, "to which the respondent contends a genuine issue exists to be tried." BLR 7056-1(a)(2). The respondent "may not rest upon the mere allegations or denials in its pleadings" but "must set forth specific facts showing that there is a genuine issue for trial. A mere 'scintilla' of evidence supporting the opposing party's position will not suffice[.]" *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106. S. Ct. 2505, 2512 (1986)). Any material facts not controverted by the respondent are deemed admitted. BLR 7056-1(a)(2).

The Court will only grant summary judgment when the evidence, viewed in the light most favorable to the nonmoving party, shows no genuine dispute of material fact. *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). A fact is material if it "might affect the outcome of the suit under the governing law …." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* At the summary judgment stage the Court "'must not resolve factual disputes by weighing conflicting evidence.'" *Tippens*, 805 F.2d at 953 (*quoting Lane v. Celotex Corp.*, 782 F.2d 1526, 1528 (11th Cir. 1986)). Further, "the court may consider any admissible facts and disregard any inadmissible statements occurring in the same affidavit." *Devan v. Zamoiski Southeast, Inc. (In re Merry Go Round Enter., Inc.)*, 272 B.R. 140, 145 (Bankr. D. Md. 2000); *see also Peterson v. Board of Trustees of the Univ. of Ala.*, 644 F. App'x 951, 954 (11th Cir. 2016).

The standard for granting summary judgment is not affected by the filing of cross-motions for summary judgment. "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A C. Wright, A. Miller & M. Cane, Fed. Prac. & Proc., § 2720 (4th ed. Apr. 2021 update).

## II. Material Facts Not in Dispute

Plaintiff filed with her motion for summary judgment a *Statement of Material Facts Not Genuinely Disputed*, to which BONYMC and Shellpoint responded. [Docs. 73, 87-1]. Plaintiff's Statement of Facts contains numerous opinions, conclusions, and characterizations, none of which are facts and, thus, will not be considered as facts. Shellpoint filed with its motion for summary judgment a *Statement of Material Facts*, and Plaintiff filed a response. [Doc. 78-1 Ex. A, Doc. 90 at 21].

### A. The Home Loan and Initial Servicing

In May 2005 Plaintiff executed an adjustable rate note to Aegis Wholesale Corporation in the amount of $636,000 to refinance her home at 456 North Saint Mary's Lane, in Cobb County, Georgia. [Docs. 73[2] ¶ 1, 87-1 ¶ 1]. On January 19, 2010, Plaintiff filed Chapter 7 case no. 10-61451 (the "Main Case"). [Docs. 73 ¶ 2, 87-1 ¶ 2]. As part of the filing, she listed BAC Home Loans ("BAC") on Schedule D as a "secured creditor" as she then supposed the meaning of the term to be. [Id.]. Plaintiff also filed a Statement of Intention seeking to have her mortgage loan reaffirmed. [Docs. 73 ¶ 3, 87-1 ¶ 3]. At the time Plaintiff filed the Main Case, she was not in default on her mortgage payments. [Id.].

---

[2] Docket entry 73 is Plaintiff's *Statement of Material Facts Not Genuinely Disputed in Support of Summary Judgment*. Docket entry 87-1 is Shellpoint and BONYMC's *Response to Plaintiff's Statement of Undisputed Facts and Statement of Facts Genuinely in Dispute*.

On October 27, 2010, BAC Home Loans Servicing LP, on behalf of the Bank of New York Mellon (the "Bank") and as its servicer, filed a motion for relief from the automatic stay in Plaintiff's bankruptcy case. [Docs. 73 ¶ 10, 87-1 ¶ 10; Main Case Doc. 14]. The Bank is a bank incorporated under the laws of New York. [Doc. 77-1 ¶ 2; Doc. 79].[3] The Bank is not a Defendant in this proceeding. Defendant BONYMC is a Delaware corporation that owns the Bank. [Doc. 72 n.1; Doc. 77-1 ¶ 1, 3; Doc. 79]. BAC subsequently withdrew the motion for stay relief on January 21, 2011. [Doc. 73 ¶ 10, 87-1 ¶ 10; Main Case Doc. 22]. On February 25, 2011, the Bankruptcy Court entered an order granting Plaintiff a discharge, which was served to BAC on February 28, 2011. [Docs. 73 ¶ 11; 87-1 ¶ 11; Main Case Docs. 23, 24].

**B. Servicing by SPS**

In November 2013, Plaintiff received notice from SPS that SPS would be the new servicer of her mortgage loan and informing her of the opportunity to apply for a loan modification. [Docs. 73 ¶ 24, 87-1 ¶ 24]. Plaintiff applied for a loan modification. [Docs. 73 ¶ 26; 87-1 ¶ 26]. SPS sent monthly statements to Plaintiff from December 2013 through September 2016. [Docs. 73 ¶ 27; 87-1 ¶ 27; 111 Ex. 1]. The monthly statements dated December 4, 2013 and January 8, 2014 included a payment due date, amount of past due payments, a payment coupon specifying the amount due, and notice that "this statement is an attempt to collect a debt." [Doc. 111 Ex. 1 at 103-111]. The monthly statements dated February 10, 2014 through September 14, 2016 included a payment due date, amount of past due payments, total amount due, a payment coupon that specified the amount due and the due date, and a notice that "[t]his is an attempt to collect a debt." [Id. at 7-102].

---

[3] Doc. 77-1 is BONYM's *Statement of Material Facts Supporting Its Motion for Summary Judgment*. Doc. 79 is Plaintiff's *Motion to Strike and Response and Objections to Defendant BONYM's Motion for Summary Judgment*. Plaintiff did not file a separate response to each of BONYMC's asserted facts, and as stated in the order denying BONYMC's motion for summary judgment, Plaintiff did not deny the facts. [See Doc. 107 at 6].

Upon receiving the mortgage statements Plaintiff experienced despair, anger, anxiety, and other emotional distress. [Docs. 73 ¶ 28-29; 87-1 ¶ 28-29]. By early 2015, Plaintiff noticed a worsening of headaches and ability to breathe and experienced for the first time chest pains and dizziness. [Docs. 73 ¶ 30, 87-1 ¶ 30]. Plaintiff sought medical attention in or around March 2015, at which time she was diagnosed with a thoracic-aortic aneurysm. [Docs. 73 ¶ 32, 87-1 ¶ 32]. Through 2011, Plaintiff had been routinely working an average of 40 hours per week and had no medical issues affecting her life or ability to work. [Docs. 73 ¶ 31; 87-1 ¶ 31]. As a result of the diagnosis and per instructions from her treating physician and the medication he prescribed, Plaintiff felt physically unable to work and did not attempt to work in 2015. [Docs. 73 ¶ 32; 87-1 ¶ 32].

The loan modification process with SPS continued throughout most of 2016. [Docs. 73 ¶ 36, 87-1 ¶ 36]. During 2016, Plaintiff's medical condition stabilized and she was able to work more hours. [Docs. 73 ¶ 38, 40; 87-1 ¶ 38, 40]. SPS transferred servicing to Shellpoint in December 2016. [Docs. 73 ¶ 37; 87-1 ¶ 37].

**C. Servicing by Shellpoint**

Shellpoint began servicing Plaintiff's loan in December 2016. [Doc. 78-1 ¶ 4; Doc. 90 at 24 ¶ 4]. Shellpoint sent Plaintiff no monthly statements during the period from December 2016 to December 2017. [Doc. 78-1 ¶ 5; Doc. 90 at 24 ¶ 5]. From April to July 2017 Plaintiff had been working 30 hours per week. [Docs. 73 ¶ 41; 87-1 ¶ 41]. On July 19, 2017, Plaintiff sent Shellpoint an application for a loan modification. [Doc. 78-1 ¶ 13; Doc. 90 at 26 ¶ 13]. Shellpoint sent Plaintiff a letter dated July 21, 2017 (the "July 21 Letter") that stated Shellpoint had received her request for a loss mitigation program, that her application was incomplete, and that requested additional information. [Doc. 78-1 ¶ 15; Doc. 90 at 26-7 ¶ 15; Doc. 111 Ex. 2]. The July 21 Letter

6

advised Plaintiff of the different loss mitigation options and stated that if she were approved for a short sale, "Shellpoint reserves the right to pursue a deficiency payment if such deficiency claim is permitted by applicable law." [Doc. 78-1 ¶ 16; Doc. 90 at 27 ¶ 16; Doc. 73 ¶ 41; Doc. 87-1 ¶ 41; Doc. 111 Ex. 2]. The July 21 Letter also stated that if the customer had received a bankruptcy discharge, the letter "constitutes neither a demand for payment nor a notice of personal liability" but "it may be a notice of possible enforcement of the lien against the collateral property[.]" [Doc. 78-1 ¶ 17; Doc. 90 at 27 ¶ 17; Doc. 111 Ex. 2]. The July 21 Letter included the loan's principal balance but did not include the total balance, the amount due, a due date, or information about how to remit payment. [Doc. 78-1 ¶ 18; Doc. 90 at 27 ¶ 18; Doc. 111 Ex. 2].

Shellpoint sent Plaintiff a letter dated July 26, 2017 (the "July 26 Letter" and with the July 21 Letter, the "July Letters") that stated Plaintiff's loan was in default and that foreclosure proceedings might be commenced and that "[i]n addition to foreclosing on the property, the owner of the mortgage loan may seek a deficiency judgment against you[.]" [Doc. 78-1 ¶ 19; Doc. 90 at 27-28 ¶ 19; Doc. 73 ¶ 42; Doc. 87-1 ¶ 42; Doc. 111 Ex. 2]. The first page of the July 26 Letter contained the following language at the bottom of the page in bold print and all capital letters: "SEE REVERSE SIDE OR ATTACHED FOR AN IMPORTANT STATEMENT OF YOUR RIGHTS." [Doc. 78-1 ¶ 20; Doc. 90 at 28 ¶ 20; Doc. 111 Ex. 2]. The second page of the July 26 Letter contained the same bankruptcy disclaimer language as in the July 21 Letter. [Doc. 78-1 ¶ 21; Doc. 90 at 28 ¶ 21; Doc. 111 Ex. 2]. The July 26 Letter included the loan's principal balance but not the total balance, the amount due, a due date, or information about how to remit payment. [Doc. 78-1 ¶ 22; Doc. 90 at 28 ¶ 22; Doc. 111 Ex. 2]. The July 26 Letter does not request payment. [Doc. 78-1 ¶ 23; Doc. 90 at 28-9 ¶ 23; Doc. 111 Ex. 2].

Thereafter, Plaintiff experienced a relapse of her medical symptoms and ceased working. [Doc. 73 ¶ 44]. She worked sporadically during 2018. [Docs. 73-1 ¶ 45; 87-1 ¶ 45].

### III. Legal Analysis

#### A. Applicable Law

A Chapter 7 discharge "discharges the debtor from all debts that arose before the date of the order for relief[.]" 11 U.S.C. § 727(b). The discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [discharged] debt as a personal liability of the debtor[.]" *Id.* § 524(a)(2). This section makes clear that personal liability is discharged when an individual receives a Chapter 7 discharge. But, it is equally clear that a Chapter 7 discharge does not avoid or otherwise affect a lien against property of the debtor. *Sellers v. Rushmore Loan Mgmt Servs.*, LLC, 941 F.3d 1031, 1035 (11th Cir. 2019); *Mele v. Bank of America Home Loans (In re Mele)*, 486 B.R. 546, 555 (Bankr. N.D. Ga. 2013) (Ellis-Monro, J.) (citing *Long v. Bullard*, 117 U.S. 617, 620-21, 6 S. Ct. 917, 918 (1886)). The test for violation of the discharge injunction is "'whether the objective effect of the creditor's action is to pressure a debtor to repay a discharged debt.'" *Roth v. Nationstar Mortg., LLC (In re Roth)*, 935 F.3d 1270, 1276 (11th Cir. 2019) (quoting *Green Point Credit, LLC v. McLean (In re McLean)*, 794 F.3d 1313, 1322, 11th Cir. 2015)). A creditor who violates the discharge injunction may be held in civil contempt under 11 U.S.C. § 105(a)[4] "if there is *no fair ground of doubt* as to whether the [discharge] order barred the creditor's conduct. In other words, civil contempt may be appropriate if there is no objectively reasonably basis for concluding that the creditor's conduct might be lawful." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1799 (2019) (emphasis in original); *Roth*, 935 F.3d at 1275; *compare McLean*, 794 F.3d at 1323 (requiring that

---

[4] "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

the creditor "was aware of the discharge injunction and intended the action that violated it[.]" in order to impose sanctions). The debtor has the burden of establishing a violation of the discharge injunction by clear and convincing evidence. *Daniels v. Howe Law Firm, P.C. (In re Daniels)*, 591 B.R. 814, 822 (Bankr. N.D. Ga. 2018) (Ritchey Craig, J.) (citations omitted).

### B. Discharge of Plaintiff's Personal Liability for the Mortgage Debt

It is undisputed that the debt at issue originated from a prepetition note and that Plaintiff received a discharge on February 25, 2011. [Docs. 72 at 3, 78, 87-1 ¶ 1, 2, 11]. Furthermore, none of the parties assert that the debt was reaffirmed, and there is no evidence of reaffirmation on the docket in the Main Case. Therefore, Plaintiff's personal liability for the debt is subject to the discharge injunction. The question, then, is whether the undisputed facts show as a matter of law that BONYMC or Shellpoint's conduct violated the discharge injunction and, if so, that they should be sanctioned for contempt.

### C. Claims Against BONYMC

BONYMC previously filed a summary judgment motion on the ground that it is the incorrect party to be sued, and the Bank is the correct party.[5] [Doc. 77]. Plaintiff argued that BONYMC could be liable through a theory of agency. BONYMC's motion was denied, due to lack of evidence regarding agency. [Doc. 107]. Plaintiff has now filed a separate adversary proceeding against the Bank and others seeking sanctions for violation of the discharge injunction, among other things. [AP No. 20-6278].

In this proceeding, Plaintiff has not asserted that BONYMC directly engaged in any conduct that violates the discharge injunction. Instead, Plaintiff argues that the Bank is liable for the acts of the three servicers of the mortgage and that BONYMC is in turn liable because it wholly

---

[5] BONYMC stated that it is a holding company that owns the Bank, which is the creditor. [Doc. 77 at 2].

owns and controls the Bank. While the fact that BONYMC wholly owns the Bank is undisputed, Plaintiff has offered no evidence that BONYMC controls the Bank and nothing in the record supports such a conclusion.[6]

As a general rule, a parent company (BONYMC) is not liable for the conduct of its wholly owned subsidiaries (the Bank) except when "1) it is appropriate to pierce the corporate veil; 2) there is apparent or ostensible agency; or 3) there is a joint venture." *Jones v. Mortg. Elec. Registration Sys., Inc.*, No. 4:12-CV-00035-HLM, 2012 WL 13028595, at *5 (N.D. Ga. Mar. 12, 2012) (citing *Kissun v. Humana, Inc.*, 267 Ga. 419, 419-20, 479 S.E.2d 751, 753 (1997)); *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S. Ct. 1876, 1884 (1998).

> Under the alter ego doctrine, equitable principles are used to disregard the separate and distinct legal existence possessed by a corporation where it is established that the corporation served as a mere alter ego or business conduit of another. … The theory of apparent or ostensible agency is the legal doctrine whereby a plaintiff may subject an alleged principal to liability if the plaintiff can establish (1) that the alleged principal held out another as its agent; (2) that the plaintiff justifiably relied on the care or skill of the alleged agent based upon the alleged principal's representation; and (3) that this justifiable reliance led to the injury. … The theory of joint venturers arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control (provided the arrangement does not establish a partnership), so as to render all joint venturers liable for the negligence of the other.

*Kissun*, 267 Ga. at 419–20, 479 S.E.2d at 752 (internal citations omitted).

The record is devoid of facts to establish any of the foregoing exceptions to the general rule that a parent is not liable for the conduct of its subsidiaries. Indeed, the only undisputed fact regarding the relationship between BONYMC and the Bank is that BONYMC owns the Bank.

---

[6] In her response to BONYMC's motion for summary judgment, Plaintiff stated that BONYMC's "own exhibit (Exhibit D 'Who We Supervise') admits that [BONYMC] had supervisory authority over" the Bank. [Doc. 79 at 2]. However, that exhibit is a printout from the website of the New York Department of Financial Services, and the "we" in "who we supervise" refers to the Department, not to BONYMC. [Doc. 77-1 ¶ 2; Doc. 77-5].

That fact alone is not sufficient to establish alter ego, agency, or joint venture. As a result, Plaintiff has not shown that BONYMC is liable for the conduct of the Bank or its servicers, and her motion for summary judgment against BONYMC will be denied.

### D. Claims Against Shellpoint

#### 1. Overview

Shellpoint began servicing Plaintiff's mortgage in December 2016. Plaintiff's complaint alleges that the July Letters, which mentioned pursuing a deficiency claim against her, violated the discharge injunction and caused fear, frustration, and mental anguish that caused a relapse of her medical condition, which resulted in reduced hours she could work. Shellpoint argues that the July Letters were not acts to collect a debt but rather were sent to explain loss mitigation options to Plaintiff and that in context, the references to a deficiency payment or judgment cannot be read as pressuring Plaintiff to pay a discharged debt. Shellpoint also contends that the July Letters fall within the safe harbor provision of § 524(j).[7] Additionally, Shellpoint argues that Plaintiff has not proven damages and has not shown that her emotional distress, medical condition,[8] and loss of income were caused by the July Letters. Finally, Shellpoint argues that Plaintiff's claims are barred by unclean hands on the ground that her discharge was obtained through fraud.

#### 2. Discrepancies in the Shellpoint Letters

Plaintiff's motion for summary judgment cites only the July Letters. However, her complaint also references a letter from Shellpoint dated June 7, 2017 (the "June 7 Letter"). [Doc.

---

[7] The discharge injunction does not apply to acts of a creditor if (1) the creditor is secured by real property that is the debtor's principal residence; (2) the act "is in the ordinary course of business between the creditor and the debtor"; and (3) the act is "limited to seeking or obtaining periodic payments" associated with its security interest in lieu of "in rem relief to enforce the lien." 11 U.S.C. § 524(j).

[8] Shellpoint also contends that some of Plaintiff's evidence regarding her medical condition is inadmissible either because it requires an expert witness or because it is hearsay.

1 ¶ 52]. Plaintiff also cites to the June 7 Letter in her reply in support of her motion for summary judgment and in her response to Shellpoint's motion for summary judgment. [Doc. 89 at 20-22; Doc. 90 at 10-11]. Plaintiff attached copies of all three letters to her complaint. [Doc. 1 Ex. E, F, G]. She also attached copies of the two July Letters to her motion for summary judgment. [Doc. 73 at 182-83 and 185]. Shellpoint also provided copies of the three letters that included pages and language absent from Plaintiff's copies. [Doc. 78 Ex. B4, B7, B8]. On May 6, 2021, the Court entered an order noting discrepancies between the copy of the July 21 Letter filed with the complaint, which consisted of one page, and the copy of the same letter filed with Plaintiff's motion for summary judgment, which consisted of two pages. [Doc. 105]. The order required Plaintiff to file full, unaltered copies of the two July Letters. In response, Plaintiff adopted Shellpoint's proffered version of the two July Letters for purposes of summary judgment. [Doc. 111 at 4].

Neither the Court's order nor Plaintiff's response to the order addressed the June 7 Letter. The copy of the June 7 Letter filed with the complaint consists of two pages, ending with the signature block of Elizabeth McJunkins. The copy filed by Shellpoint includes a third page consisting of notices and disclaimers. Shellpoint's copy also includes a sentence at the bottom of the first page above a serial number that says in bold type: "SEE REVERSE SIDE OR ATTACHED FOR AN IMPORTANT STATEMENT OF YOUR RIGHTS." Plaintiff's copy shows the serial number but does not include the bolded sentence above the serial number. In its reply in support of its motion for summary judgment, Shellpoint asserts that Plaintiff filed a copy of the June 7 Letter as part of her verified amended complaint in *White-Lett v. The Bank of New York Mellon et al.*, Case No. 19-1-723-52, Ex. J (Cobb Cty., Ga. Sup. Ct. Aug. 9, 2019). Shellpoint filed a certified copy of the Cobb County complaint at Doc. 102-2. The copy of the June 7 Letter

that Plaintiff filed with the Cobb County complaint includes the bold statement at the bottom of page 1 and the third page. [Doc. 102-2 at 183-185]. In all other respects, it appears to be identical to Shellpoint's copy. Based on the foregoing, the Court finds that the copy of the June 7 Letter provided by Shellpoint is a full and accurate copy of the letter, and the Court will refer to Shellpoint's copy in analyzing the motions for summary judgment.

### 3. Whether Shellpoint's Letters Violated the Discharge Injunction

The first letter at issue is the June 7 Letter. It is titled "Notice of Referral to Foreclosure." In the upper right hand corner, the letter contains a box with the total due and the principal balance. The letter says in part:

> **Your mortgage loan payment is past due and your property may be referred to foreclosure unless immediate action is taken.**
>
> You may be able to avoid foreclosure by paying the total amount necessary to bring the account current (see "Important Account Information").
>
> We want to give you important information about the status of your account and discuss next steps.
> …
> Noteholder is unable to find the original promissory note you signed and will seek to prove the promissory note using a lost note affidavit.

[Doc. 78-6 Ex. B4 (emphasis in original)]. The letter includes a section titled "Important Account Information as of 06/07/17" that includes the amount needed to bring the loan current, amount of the principal balance, date through which the account is paid, date of last full payment, which payment is due, the interest rate, the next date when the interest rate may adjust, prepayment fee, and amount of late fees included in the amount due. The second page of the letter includes sections for "Loss Mitigation Options," "Borrowers Responsibilities," "Additional Account Information," and "Assistance available to you." The third page of the letter says:

> This is an attempt to collect a debt ….

> If you are a customer in bankruptcy or a customer who has received
> a bankruptcy discharge of this debt: please be advised that this notice
> is to advise you of the status of your mortgage loan. This notice
> constitutes neither a demand for payment nor a notice of personal
> liability to any recipient hereof, who might have received a
> discharge of such debt in accordance with applicable bankruptcy
> laws …. However, it may be a notice of possible enforcement of the
> lien against the collateral property, which has not been discharged
> in your bankruptcy.

[Doc. 78-6 Ex. B4].

Plaintiff argues that the June 7 Letter states that the original note was lost and that "a 'lost note affidavit' would be used **to enforce it**." [Doc. 89 at 20; Doc. 90 at 10 (emphasis is Plaintiff's)]. However, the letter does not say that a lost note affidavit would be used to "enforce" the note; it says the affidavit would be used to "prove" the note. This is a significant distinction given the totality of the letter, which is to provide information about foreclosure and options for preventing foreclosure, when the basis for foreclosure is Plaintiff's default on the note. The letter contains no demand for payment, no payment coupon, and no due date. Although it provides the amount due on the note, that amount is necessary information for Plaintiff to avoid foreclosure. Additionally, the letter says it is an attempt to collect a debt, but that statement is followed by the bankruptcy disclaimer. Even disregarding the disclaimer language, the letter is wholly focused on foreclosure, that is enforcement of a lien and not enforcement of a note, thus the June 7 Letter does not pressure Plaintiff to pay a discharged debt. Therefore, the June 7 Letter does not violate the discharge injunction.

The July 21 Letter includes the following language:

> **Shellpoint Mortgage Servicing ("Shellpoint") has received your
> request for a loss mitigation program.** However, because you
> have not provided all the documentation previously requested, your
> response package is currently considered incomplete. If we do not
> receive the required documents by 08/20/2017, we may conclude

14

> that you have withdrawn your request for a modification and may
> resume other means to collect any amounts due on your account. …
> …
> Please continue to make your monthly payment according to your
> loan agreement.
> …
> Should your loan not qualify for a particular loss mitigation program
> such as a modification, we will review your loan for other possible
> workout options or foreclosure alternative such as a short sale or
> Deed in Lieu. … If approved for a short sale, Shellpoint reserves the
> right to pursue a deficiency payment if such deficiency claim is
> permitted by applicable law. …

[Doc. 111 at 113 (emphasis in original)]. Page 3 of the July 21 Letter contains the same bankruptcy

disclaimer as the last page of the June 7 Letter. A box at the top right of the letter shows the

principal balance on the loan.

> The July 26 Letter contains the following language:

> The above referenced mortgage loan serviced by Shellpoint
> Mortgage Servicing ("Shellpoint"), on the above referenced
> property is in default and foreclosure proceedings have or may soon
> commence. Because you have not taken steps to resolve the
> delinquency, we have been instructed by the owner of your
> mortgage loan to commence foreclosure.

> In addition to foreclosing on the property, the owner of the mortgage
> loan may seek a deficiency judgment against you if the proceeds
> from the foreclosure sale do not pay off the amount you owe on the
> mortgage loan.

[Doc. 111 at 116]. The letter goes on to talk about alternatives to foreclosure that may be available.

Page 2 of the letter contains the same bankruptcy disclaimer language as in the June 7 and July 21

Letters. A box at the top right of the letter shows the principal balance on the loan.

Plaintiff argues that these letters threaten her with personal liability and the

boilerplate disclaimers in the letters are not sufficient to overcome their coercive effect. With

respect to the July 21 Letter, Plaintiff takes issue with the language that "If approved for a short

sale, Shellpoint reserves the right to pursue a deficiency payment if such deficiency claim is

permitted by applicable law." Plaintiff claims the reference to pursuing a deficiency claim is an attempt to collect a debt. However, the entirety of the sentence indicates a deficiency claim might be pursued in the event of a short sale and if such a claim is permitted by applicable law. Nothing in Plaintiff's papers indicates she has contemplated a short sale. Instead, her focus has been on obtaining a loan modification. More importantly, applicable law—the discharge injunction—does not permit Shellpoint to pursue a deficiency claim. This disclaimer appears in the same sentence as the reference to the deficiency claim.

With respect to the July 26 Letter, Plaintiff takes issue with the language that "the owner of the mortgage loan may seek a deficiency judgment against you if the proceeds from the foreclosure sale do not pay off the amount you owe on the mortgage loan." This language is not immediately followed by any sort of disclaimer. Plaintiff contends that in a separate lawsuit she filed in district court, the judge ruled that this same language could be perceived as threatening a deficiency judgment. Plaintiff's briefs excerpt what appears to be an order on a motion to dismiss in which Magistrate Judge Walker says of the July 26 Letter:

> The Court finds it plausible that "the least sophisticated consumer" could find Shellpoint's statement that the owner "may seek a deficiency judgment" could be perceived as threatening a deficiency action to the "least sophisticated consumer." … [T]he Court finds it plausible that Shellpoint's alleged statement could be perceived by the "least sophisticated consumer" as threatening a deficiency judgment.

[Doc. 89 at 16-17; Doc. 90 at 5-6 (citing *White-Lett v. New Penn Financial et al.*, Case No. 1:17-cv-03385-CC-LTW, Doc. 55 at 29-30)]. Plaintiff argues that a bankruptcy disclaimer would not change the result. *Johnson v. Fay Servicing, LLC*, no. 1:17-cv-2513-CC-JCF, 2018 WL 5262078, at *12 (July 2, 2018), *report and recommendation adopted by* 2018 WL 5262049, at *13 (Sept. 19, 2018) ("persuasive authority suggests that [bankruptcy] disclaimers are insufficient by

themselves to warrant dismissal of a plaintiff's FDCPA claim."); *Gagnon v. JP Morgan Chase Bank, N.A.*, 563 B.R. 835, 844 (N.D. Ill. 2017) (declining to dismiss FDCPA claims against a mortgage servicer whose dunning letters included a bankruptcy disclaimer because the letters "are not so clear that the Court can conclude at the motion to dismiss stage that the letters are informational rather than attempts to collect debt, or that the letters' disclaimers make their informational nature sufficiently clear to the unsophisticated consumer"; the court dismissed claims for violation of the discharge injunction on the ground that they should have been brought in the bankruptcy court).

However, the cases cited by Plaintiff—including the order from Judge Walker— involve application of the "least sophisticated consumer" standard to determine whether communications from a debt collector are deceptive, misleading, unconscionable, or unfair under the FDCPA. The Eleventh Circuit is clear that the standard does not apply here:

> This Court has never incorporated the "least sophisticated consumer" test into our § 524 analysis. And for good reason—what counts as "debt collection" under one statutory scheme is not necessarily "debt collection" under the other … There is nothing in either statue that suggests we should evaluate potential § 524 violations using the FDCPA standard, and we find no other reason to do so.

*Roth*, 935 F.3d at 1277-78.

Plaintiff also argues that boilerplate disclaimer language does not overcome the coercive effect of language that purports to enforce personal liability against a debtor and cites several cases in support of her argument. *McConnie Navarro v. Banco Pupular De Puerto Rico (In re McConnie Navarro)*, 563 B.R. 127 (Bankr. D.P.R. 2017); *Todt v. Ocwen Loan Serv., LLC (In re Todt)*, 567 B.R. 667 (Bankr. D.N.H. 2017); *Mele*, 486 B.R. 546; *Ocwen Loan Serv., LLC v. Marino (In re Marino)*, 577 B.R. 772 (BAP 9th Cir. 2017), *aff'd in part on other grounds by* 949

F.3d 483 (9th Cir. 2020), *cert denied* 141 S. Ct. 1683 (2021). However, none of the cases cited by Plaintiff have facts similar to those at issue here.

In *Marino*, the debtors surrendered and vacated their residence during the bankruptcy, and the creditor obtained stay relief. 577 B.R. at 777-78. Nevertheless, for two years after the debtors received a discharge, the servicer mailed correspondence to the debtors and called approximately one hundred times. *Id.* at 777, 780. Out of twenty-two pieces of correspondence, fifteen had disclaimers and those disclaimers were often "preceded by demands for payment by a certain date or information about the amount that 'you must pay' in a much more conspicuous font." *Id.* at 777, 784. Seven items had no disclaimers. *Id.* at 784. The Bankruptcy Appellate Panel said that these communications

> went far beyond what was necessary to protect or enforce Ocwen's lien rights …. The notices and statements gave the impression that the [debtors] were still liable for the mortgage payments, taxes, and force-placed insurance premiums. *Even if some of the notices may not have violated the discharge injunction*, the bankruptcy court correctly noted that *the cumulative effect* of all of the letters demanding money created the perception that the [debtors] needed to pay Ocwen.

*Id.* (emphasis added). The court expressly rejected the creditor's argument that the disclaimers protected it from liability because (1) some of the letters had no disclaimer; (2) thirteen of the letters with disclaimers used hypothetical language, such as "if you have received a discharge"; (3) those letters that acknowledged the debtors' discharge also demanded payment such that they were internally inconsistent and likely confusing; and (4) the letters were generic notices rather than notices consistent with the known status of the debtors. *Id.* at 784-85.

Similarly, in *Todt*, after the debtors received a discharge, the creditor sent twenty-one monthly statements that included the amount due, a statement that past due amounts were "due immediately," an amount of outstanding fees, and a payment coupon with the amount due. 567

B.R. at 672. The front of the statements included a notice that if the recipient had filed for bankruptcy to read important information on the back of the statement. *Id.* The back of the statement included a generic bankruptcy disclaimer. *Id.* The court found that the statements were attempts to collect discharged debts and the disclaimer did not insulate the creditor from liability. *Id.* at 679.

> No pro forma bankruptcy disclaimer can overcome the effects of repeated and continuous communications in which Ocwen took the position that these obligations were collectible. The use of a pro forma bankruptcy disclaimer is not a "get out of jail free" card that can absolve a creditor of liability for a pattern of conduct that is inconsistent with the terms of the disclaimer itself.

*Id.*

In *Mele* the court noted that the cumulative effect of relentless communications from a mortgage creditor can result in the violation of the discharge injunction notwithstanding the presence of a disclaimer. 486 B.R. at 556. But it found no such violation. The court considered fifteen letters sent by the creditor, which it divided into four categories: (1) informational, (2) FHA information, (3) responses, and (4) statements. *Id.* at 550. The court found that none of the documents on its own violated the discharge injunction. *Id.* at 557-58. The information in the documents were either solely informational or the documents clearly stated that they were for informational purposes, they did not contain any demands for payment, and the amount owed was only included when required by law. *Id.* at 557.

The debtor in *Mele* made the same argument Plaintiff makes here—that is, that when a document includes words of collection or demand for payment, a disclaimer in the same document can cause confusion. *Id.* at 557-58. The court, therefore, considered the collective effect of the documents as well as alleged telephone calls and alleged contacts from individuals driving by the debtor's house and entering her yard to determine if the debtor was still there. The court

determined that collectively, the documents were generally informational in nature and were not an attempt to collect on personal liability. *Id.* at 558. *See also McConnie Navarro*, 563 B.R at 149 (acknowledging that "disclaimer language may not be used to shield an improper demand for payment *should there be one*" but finding no such improper demand and finding that the cumulative effect of the lender's correspondence did not constitute an attempt to collect a debt) (emphasis added). The other contacts were "entirely consistent with the exercise of *in rem* rights and not with demand for payment." 486 B.R. at 558. The court concluded that while the debtor did suffer distress, its cause was the debtor's "misunderstanding of the effect of her discharge and its impact on the obligation secured by her home, and not due to any violation of the discharge injunction[.]" *Id.*

In both *Marino* and *Todt*, the creditor sent multiple communications that objectively sought to collect on the debtors' personal liability for a debt, which could not be overcome by a hypothetical or generic bankruptcy disclaimer. *See also Lemieux v. America's Serv. Co. (In re Lemieux)*, 520 B.R. 361, 367-68 (Bankr. D. Mass. 2014) (coercive effect of correspondence that consisted of more than twelve pages regarding insurance coverage that contained multiple demands for action and payment could not be overcome by a single bankruptcy disclaimer in reduced type on page three). Here, Plaintiff has identified only three letters with problematic language; there is no "repeated and continuous" coercive communication. Additionally, none of the letters includes any demand for payment and the overall tone is informational. In that way this case is more like *Mele*. Neither the individual letters sent by Shellpoint, nor their cumulative effect amounts to an attempt to collect a debt. To the extent the letters reference a possible deficiency claim or judgment, that language does not violate the discharge injunction because the letters did not demand payment, were informational in nature,

and contained a bankruptcy disclaimer. Because Shellpoint has not violated the discharge injunction, the Court will grant its motion for summary judgment and will deny Plaintiff's motion for summary judgment against Shellpoint.

## IV. Conclusion

With respect to BONYMC, Plaintiff has failed to establish that it is liable for any alleged violations of the discharge injunction by the servicers of Plaintiff's mortgage loan. With respect to Shellpoint, the Court concludes its correspondence with Plaintiff did not violate the discharge injunction. For the foregoing reasons, it is

ORDERED that Plaintiff's Motion for Summary Judgment Against BONYMC and Shellpoint is DENIED; it is further

ORDERED that Shellpoint's Motion for Summary Judgment is GRANTED.

**END OF ORDER**

**<u>Distribution List</u>**

Shirley White-Lett
456 North Saint Marys Lane
Marietta, GA 30064

Chandler P. Thompson
Akerman LLP
Suite 725
170 South Main Street
Salt Lake City, UT 84101

Alan Michael Hurst
Akerman LLP
Suite 725
170 South Main Street
Salt Lake City, UT 84101

Grant E. Schnell
Holland & Knight LLP
1180 West Peachtree Street, NW
Suite 1800
Atlanta, GA 30309